UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RALPH FRANCIS SLATER III,       )
                                )
    Plaintiff,                  )
                                )
       v.                      )   Case No. 3:16-cv-30147-KAR
                                )
NANCY A. BERRYHILL,             )
Acting Commissioner of Social   )
Security Administration,        )
                                )
    Defendant.[1]               )

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Dkt. Nos. 12 & 22)

ROBERTSON, U.S.M.J.

**I.**     **Introduction**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Ralph Francis Slater III ("Plaintiff") appeals the decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), denying his claim for Social Security Disability Insurance ("SSDI"). Plaintiff asserts that the Commissioner's decision denying him such benefits – memorialized in an April 20, 2015 decision by an administrative law judge ("ALJ") – is in error. Specifically, Plaintiff alleges that the ALJ erred (1) by attributing a medical opinion to the wrong treating source in his decision; (2) in his assessment of Plaintiff's credibility; and (3) by not including postural, manipulative, and environmental limitations in his residual functional capacity assessment. Plaintiff has moved for judgment on the pleadings, requesting that the Commissioner's decision be reversed,

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill has been substituted for Carolyn W. Colvin as Acting Commissioner of the Social Security Administration.

or, in the alternative, remanded for further proceedings (Dkt. No. 12). The Commissioner has moved for an order affirming the decision of the Commissioner (Dkt. No. 22). The parties have consented to this court's jurisdiction (Dkt. No. 15). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will deny Plaintiff's motion and allow the Commissioner's motion.

## II.     Procedural Background

Plaintiff applied for SSDI on June 25, 2013, alleging a November 12, 2012 onset of disability (Administrative Record ("A.R.") at 190-91). Plaintiff's application was denied initially and on reconsideration (*id*. at 128-130, 135-37). Plaintiff requested a hearing before an ALJ, and one was held on February 10, 2015 (*id*. at 48-93, 138-39). Following the hearing, the ALJ issued a decision on April 20, 2015, finding that Plaintiff was not disabled and denying Plaintiff's claim (*id*. at 26-43). The Appeals Council denied review on July 5, 2016, and the ALJ's decision became the final decision of the Commissioner (*id*. at 1-6). This appeal followed.

## III.    Legal Standards

### A. Standard for Entitlement to Social Security Disability Insurance

In order to qualify for SSDI, a claimant must demonstrate that he or she is disabled within the meaning of the Social Security Act.[2] A claimant is disabled for purposes of SSDI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

---

[2] For SSDI, the claimant also must demonstrate that the disability commenced prior to the expiration of his insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1).

U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 404.1520. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id*. *See also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id*. "RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause

physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690 F.2d at 7, including the burden to demonstrate RFC. *Flaherty v. Astrue*, No. 11-11156-TSH, 2013 WL 4784419, at *9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

### B. Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id*. (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs*., 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs*., 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir. Office of Workers' Comp.*

*Programs, U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

**IV. Facts**

A. Background

Plaintiff was 43 years old on the alleged disability onset date (A.R. at 36). He has a high school education and previously worked as a sheet metal fabricator, delivery driver, order selector, and yard manager (*id*. at 54, 88). When he applied for SSDI, he alleged disability due to neck and back pain, neck injury, back injury, and diabetes (*id*. at 208). At the hearing, Plaintiff claimed disability due to a combination of physical impairments, including back pain radiating down his legs, knee pain, headaches, carpal tunnel syndrome, and diabetes (*id*. at 63-81).

B. Medical Evidence

1. *Pre-Hearing Treatment Records*

On December 14, 2012, Plaintiff was evaluated by Scott Cowan, M.D., of New England Orthopedic Surgeons for neck and back pain that radiated down his legs (*id*. at 719-720). Plaintiff reported having sustained an injury at work on October 30, 2012, when he was lifting an 80 pound piece of sheet metal and experienced the onset of pain (*id*.). Following his work injury, Plaintiff had nine visits of physical therapy, but reported that they were minimally

effective (*id*.). Subsequently, Plaintiff had an MRI of his thoracic spine, which Dr. Cowan reviewed and noted was "essentially unremarkable" (*id*.). Lumbar spine radiographs showed an old compression fracture at L1, which was minimally compressed, but were otherwise "really unremarkable as well" (*id*.). Plaintiff reported bilateral radiating leg pain, which was achy in quality, as well as numbness and weakness (*id*.). Plaintiff reported that the pain worsened with activity, but was relieved if he reclined (*id*.). Dr. Cowan observed Plaintiff to be morbidly obese and in no acute distress (*id*.). Plaintiff rose from a seated position without difficulty (*id*.). Upon examination, Plaintiff had a reduced range of motion (60% of normal) of the neck, tenderness to deep palpation of the cervicothoracic junction region, and tenderness to mild palpation throughout the thoracolumbar spine (*id*.). While his gait was within normal limits, Plaintiff experienced pain with hip and knee range of motion and seated straight leg raising (*id*.). Dr. Cowan noted that Plaintiff had "examination inconsistencies" raising "secondary gain" questions (*id*.). Dr. Cowan recommended that Plaintiff continue with his non-operative care regimen with John Bedford, M.D., Plaintiff's primary care physician, and Ronald Paasch, M.D., at Pioneer Spine & Sports Physicians (*id*.).

Plaintiff saw Dr. Bedford on December 17, 2012, at which time Dr. Bedford noted that Plaintiff had seen Dr. Cowan, who "reportedly did not feel any surgical intervention was indicated …" (*id*. at 278-79). On that same date, Dr. Bedford indicated in a To Whom It May Concern letter that Plaintiff could not return to work for two weeks because his pain was intensified by movement and vibration (*id*. at 710). In the letter, Dr. Bedford also stated that he

6

would reevaluate Plaintiff on December 31, 2012, and that Plaintiff was waiting on approval of a specialist appointment with Dr. Paasch (*id*.).

As contemplated, Plaintiff returned to Dr. Bedford on December 31, 2012 (*id*. at 276-77). At the time, Plaintiff indicated that he felt that his symptoms were relieved by pain medications and had improved some with an increase in Fentanyl (*id*.). Upon examination, Plaintiff exhibited tenderness in the region of his lumbar spine (*id*.).

Plaintiff saw Dr. Paasch on January 31, 2013 (*id*. at 348-350). Plaintiff's history included persistent low back and bilateral lower extremity pain since October, with the pain radiating posteriorly down his legs into his calves and which worsened with prolonged standing or sitting (*id*.). Dr. Paasch noted that an x-ray of the lumbar spine showed no significant abnormality except for some mild degenerative changes (*id*.). Dr. Paasch also noted that Plaintiff had been in physical therapy, but that it had not been significantly helpful, and that Plaintiff had obtained an orthopedic consultation, but aggressive intervention had not been recommended (*id*.). Plaintiff was status post caudal epidural injection, but reported only one day of significant pain relief (*id*.). Upon examination, Plaintiff walked with a normal gait, but reported discomfort with both lumbar flexion and extension, exhibited tenderness in the iliolumbar area bilaterally, and had a positive leg test bilaterally (*id*.). Dr. Paasch recommended obtaining an updated MRI of the lumbar spine to rule out a disc herniation or stenosis and nerve root impingement (*id*.).

Plaintiff continued to see Dr. Paasch on a monthly basis through June 24, 2013 for persistent pain (*id*. at 330-347). On February 12, 2013, Dr. Paasch noted that a recent EMG showed "a significant disc bulge L4-5 and a possible free disc fragment with lipomatosis and

7

crowding of the canal and possible L5 nerve roots" (*id*. at 345). Plaintiff was to be scheduled for bilateral L5 transforaminal epidural injections (*id*. at 347).

On March 11, 2013, Plaintiff saw Dr. Bedford, who stated that he recommended a "strong effort at weight loss and core strengthening" (*id*. at 699). He wrote, "I do think his protuberant abdomen is a significant factor in his low back pain situation" (*id*.).

On May 6, 2013, Plaintiff saw Dr. Paasch, who noted that, given Plaintiff's "lack of improvement with all conservative treatment to date and his ongoing low back and cervical complaints we will set him up for consultation for cervical stim[ulator] trial to see if we can obtain pain coverage for both his neck and low back" (*id*. at 341). Plaintiff was seen at Pioneer Spine & Sports on June 14, 2013 for a follow-up evaluation prior to proceeding with the spinal cord stimulator trial (*id*. at 324-25). Upon examination, Plaintiff had normal station, a nonantalgic gait, and strength of 5/5 in the upper extremities (*id*.). While he had lower back pain, results from a straight leg test were equivocal bilaterally (*id*.).

Scott Cooper, M.D. implanted the stimulator on June 19, 2013 and, on June 24, 2013, Plaintiff indicated that it had decreased his symptoms; before use of the spinal cord stimulator, his pain was an 8 or 9 on a 10-point scale, while with it his pain was a 3 or 4 (*id*. at 327, 330). Plaintiff was pleased with the decrease in pain and planned to undergo permanent placement of a spinal cord stimulator with Dr. Cowan, which he did on October 1, 2013 (*id*. at 332). At his post-operative visits on October 22, 2013 and November 19, 2013, Plaintiff was doing well, had minimal discomfort, and was transitioning easily and ambulating without difficulty (*id*. at 713, 716).

On October 29, 2013, Plaintiff saw Dr. Bedford (*id*. at 400-02). He reported that his neck felt 85% better with the insertion of the cervical spinal cord stimulator (*id*.). Plaintiff indicated

that he was still feeling persistent pain in his lower back and that he was being considered for a second stimulator in the lumber region (*id*.).

Plaintiff saw Dr. Paasch on November 15, 2013, at which time he reported significant improvement in his neck, but complained of ongoing low back pain (*id*. at 738-740). In April 2014, Plaintiff again saw Dr. Paasch, who observed that Plaintiff was able to walk with a normal gait, although straight leg tests were positive bilaterally (*id*. at 735-37). Dr. Paasch indicated that "[g]iven his presentation we will attempt to get him his stimulator trial" (*id*.).

Plaintiff was seen by Dr. Bedford on May 28, 2014, at which time Plaintiff was still awaiting a decision on the second stimulator in the lumbar region (*id*. at 593-95). At the time, Plaintiff indicated that his lower back pain was relieved by his pain medications (*id*.).

Plaintiff was approved for the dorsal column stimulator trial, and it was implanted by Dr. Cooper on July 23, 2014 (*id*. at 752-53). Plaintiff experienced a significant reduction in his lower back pain, reporting to Dr. Pasch on July 28, 2014, that his pain had gone from an 8 on a 10 point scale to a 3 or 4 (*id*. at 749). Plaintiff was eager to proceed with permanent placement (*id*. at 751). Dr. Cowan implanted the permanent dorsal column stimulator with thoracic laminotomy on January 26, 2014 (*id*. at 782).

### 2. *State Agency Opinions*

Jacinto DeBorja, M.S., a state agency expert who reviewed Plaintiff's medical records as of December 2013, assessed Plaintiff as being limited to occasional lifting and carrying no more than twenty pounds and frequent lifting and carrying ten pounds (*id*. at 103-114). Dr. DeBorja indicated that Plaintiff could stand or walk for a total of four hours and sit for a total of about six hours in an 8-hour workday (*id*.). Dr. DeBorja imposed no limitations on Plaintiff's ability to push or pull, including operation of hand and/or foot controls, other than the lift and carry

9

restrictions (*id*.). Dr. DeBorja also determined that Plaintiff could frequently climb ramps/stairs and balance, occasionally stoop, kneel, crouch, and crawl, and never climb ladders/ropes/scaffolds (*id*.). Dr. DeBorja assessed Plaintiff as being limited to only occasional overhead reaching due to his neck pain and limited range of motion (*id*.). Regarding environmental limitations, Dr. DeBorja indicated Plaintiff should avoid concentrated exposure to extreme heat and humidity and avoid even moderate exposure to vibration and hazards (*id*.). Dr. K. Malin Weeratne, a state agency consultant who reviewed Plaintiff's medical records in May 2014, agreed with Dr. DeBorja's opinion (*id*. at 115-127).

### C. Hearing Testimony

#### 1. *Plaintiff's Testimony About His Medical Conditions*

Plaintiff identified his neck and spine problems as the conditions that prevent him from being able to work (*id*. at 55). He indicated that he suffers from pain as a result of his neck and spine conditions, but not from mobility problems (*id*. at 56). Plaintiff testified that his pain was located throughout his whole back and neck (*id*. at 63). With regard to his back pain, Plaintiff testified that the pain in his lower back traveled down both legs and both calves (*id*.). He described the pain in his back as "stabbing pains that run up and down," while the pain in his legs was "like hooks being put in at the top of the calf muscle, pulling straight down towards the ground at all times" (*id*. at 64). Plaintiff noted that the pain was constant, but sometimes worse than others (*id*.). Plaintiff testified that his back pain was made worse by driving, riding in a car, and movement (*id*. at 65). Plaintiff testified that if he has to spend a lot of time in the car, the next day he cannot move because he is in so much pain from the vibration in the car (id. at 75).

Plaintiff testified to using pain medications – Percocet and a Fentanyl patch – to ease the pain, but indicated that "[s]ometimes they might take a little bit of the edge off, but sometimes

10

they … do nothing" (*id*. at 56, 69). He testified that he had undergone physical therapy and injections in his neck and back without relief (*id*. at 64). Plaintiff testified that he had stimulators implanted in his neck and back (*id*. at 57, 64). The stimulator in his neck "worked great" for a while, until it started causing headaches (*id*. at 57, 65). As a result, he stopped using it for a "couple weeks" (*id*. at 57-58, 65). After getting the other stimulator implanted in January 2015, he started using the neck stimulator again, and it seemed to be working "a little bit again without the headaches" (*id*. at 58, 65). Plaintiff testified that the back stimulator was providing some relief to his lower back, but not great relief (*id*.). He indicated that he obtained better relief during the trial (id. at 65). Plaintiff acknowledged, however, that he had only had the back stimulator implanted two or three weeks earlier (*id*. at 59, 65).

Plaintiff testified that he experienced headaches with his neck pain two to three days a week (*id*.). He described the headaches as severe (*id*.). Plaintiff indicated that he had seen a neurologist regarding the headaches, and the neurologist prescribed a muscle relaxant and physical therapy, the latter of which Plaintiff had not yet started (*id*. at 66). Plaintiff testified that the muscle relaxant helped "[a] slight bit" (*id*.).

Plaintiff stated that he suffers from mild arthritis in both knees (*id*.). He described experiencing a grinding pain in his knees all the time, which is exacerbated by wet weather (*id*. at 67).

Plaintiff testified that he has had surgery to each of his hands to treat carpal tunnel syndrome (*id*.). Initially, he obtained significant relief, but, according to Plaintiff, the tingling in his fingers was starting to return (*id*. at 68). Plaintiff described both tingling and numbness that comes and goes (*id*.). Plaintiff testified that he sometimes wears wrist braces when the pain "gets too much" (*id*.). Plaintiff described dropping things at times, but denied difficulty opening

11

jars or with zippers or buttons (*id*. at 68-69). Plaintiff also indicated that he severed the tendon in the middle finger on his left hand and cannot close the finger all the way (*id*. at 68). He indicated that he suffers from "trigger finger" and has had surgery to two of his fingers to treat it (*id*.).

Plaintiff indicated that he suffers from diabetes, for which he takes insulin and other medication and checks his blood sugar two to three times per week (*id*. at 80). Plaintiff's diabetes symptoms include dry mouth and frequent urination (*id*. at 81).

Plaintiff testified that he could sit comfortably for 20-25 minutes before needing to get up and move around, stand for 15-20 minutes before needing to sit down, and walk 100-150 yards (*id*. at 69-70). Plaintiff testified that he could lift and carry 15 pounds without too much pain and that going up and down stairs was slow and painful (*id*. at 70).

Plaintiff indicated that his sleep is "choppy," and he gets maybe four hours of sleep per night (*id*. at 70, 79). He wakes up in the morning tired and in pain and tries to take naps during the day to compensate (*id*. at 79). Plaintiff testified that he has good days and bad days in equal measure and that on bad days, the pain is so intense, all he wants to do is lay down (*id*. at 79-80). On good days, Plaintiff "can function a little bit, but every movement is still labored (*id*. at 80).

Plaintiff testified that, at home, he cooks once a week at most because it hurts to stand in the kitchen and cook (*id*. at 77). Plaintiff cannot do dishes because it hurts too much to reach down into the sink (*id*.). Plaintiff helps out with laundry, but cannot carry the baskets (id.). Plaintiff occasionally goes along to the grocery store, but cannot grocery shop alone (*id*. at 77-78).

### 2. *VE's Testimony*

The vocational expert (VE) testified that a hypothetical individual of Plaintiff's age, educational background, and work history, with an RFC for sedentary work, with the additional

limitation that he could change position as needed could perform jobs as a telephone information clerk (DOT #237.367-046), a food and beverage order clerk (DOT #249.362-026), and a charge account clerk (DOT #205.367-014) and that that each of these jobs would be available in numbers of at least 100 in Massachusetts and 1,000 nationally (*id*. at 59-60, 88).  The VE testified that adding to the first hypothetical that the individual would miss work approximately three times per month due to symptoms or treatment or would be off-task approximately twenty-five percent of the workday would preclude all work by that individual on a full-time, sustained basis (*id*.).

### 3. Plaintiff's Testimony About His Ability to Work

Plaintiff testified that other than being, at times "not as cognitively with it as I want to be," he could do the food and beverage order clerk and charge account clerk jobs identified by the VE full-time (*id*. at 62-63, 70-72).

### 4. Plaintiff's Testimony About His Doctors' Advice Re His Weight

Plaintiff testified that he is 5' 9" tall and weighs 280 pounds (*id*. at 78).  The ALJ inquired about any advice from his doctors about his weight and its effect on his pain (*id*.). Plaintiff testified that Dr. Bedford never told him he "need[s] to drop 100 pounds," or that his "weight as it currently stands affects [his] pain in a bad way" (*id*. at 78-79, 85).  Plaintiff testified that Dr. Cowan told him he was "a little bit on the heavy side, but he never told [him he] should lose weight" (*id*. at 79).  Neither doctor, according to Plaintiff, told him that his weight was implicated in the pain that he experiences (*id*. at 86).

### D. Post-Hearing Evidence

Following the hearing, the ALJ sent letters to Drs. Bedford and Cowan asking whether either had advised Plaintiff that his weight exacerbated his spinal pain (*id*. at 258, 262).  Dr.

13

Bedford responded that he had discussed with Plaintiff "on numerous occasions, the benefits of weight loss," in regard to his back pain (*id*. at 778). Dr. Cowan responded that "[a]ll obese patients are advised that if they are having back pain then weight less [sic] could lessen their symptoms" (*id*. at 779).

On February 27, 2015, Plaintiff saw Dr. Cooper at Pioneer Spine & Sports (*id*. at 785-87). Plaintiff reported that he was not experiencing significant pain control with the thoracic spinal cord stimulator (*id*.). Dr. Cooper noted this was "disappointing" because Plaintiff had an excellent response during his trial (*id*.). Dr. Cooper also noted that the cervical stimulator provided therapeutic benefit, although it sometimes seems to exacerbate headaches (*id*.). Upon examination, Plaintiff walked with normal gait and station, his lower extremity motor strength was intact, his coordination was normal, and he had good mobility of all extremities (*id*.). Dr. Cooper indicated that Plaintiff asked him if he had the potential for full time gainful employment (*id*.). Dr. Cooper wrote, "[m]y feeling is that at present, he is able to work at a sedentary position but only part-time" (*id*.).

### V.     The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date (*id*. at 31). At the second step, the ALJ found that Plaintiff had severe impairments consisting of: "failed back syndrome, chronic pain syndrome, diabetes, cervical and lumbar degenerative joint/disc disease, herniated nucleus pulposes of the L-45 [sic] spinal level, [and] obesity (*id*. at 32 (footnote omitted)). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart

P, Appendix 1 (*id*. at 35). Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to "perform sedentary work as defined in 20 C.F.R. 404.1567(a)[3] except he would require a sit/stand option at his discretion" (*id*. at 36). At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work (*id*.). At step five, relying on the testimony of an independent vocational expert, the ALJ determined that Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (*id*.).

## VI. Analysis

### A. Misattribution of Medical Opinion

In his decision, the ALJ evaluated the opinions of medical care providers and reviewers who opined on the claimant's vocational capacity and stated:

> Dr. Cowan – I give his views, as expressed in exhibit 34F, considerable weight, as he is well-trained in the field on which he opined, and has examined and treated the claimant over a period of time. I do not regard his views as inconsistent with my conclusion, in view of the claimant's hearing testimony. However, to the extent Dr. Cowan's views are inconsistent with those of the claimant indicating he saw no reason he could not perform certain jobs full-time, I reject them for the reason that no one knows a lucid person's condition better than the person himself.

(Id. at 35). Plaintiff claims that this represents an error of law because exhibit 34F is the post-hearing report from Dr. Cooper, not Dr. Cowan. According to Plaintiff, as a result, it is unclear as to which physician's opinion the ALJ is assessing "considerable weight." The court disagrees. Given the ALJ's unequivocal reference to exhibit 34F, which contains Dr. Cooper's statement

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

15

that, "[m]y feeling is that at present, he is able to work at a sedentary position but only part-time," it is clear that the ALJ is referencing the record of Plaintiff's February 27, 2015 visit with Dr. Cooper. As the government notes, there is no evidence that the misidentification was anything but a harmless scrivener's error, particularly given the similarity of the two doctors' names and roles in Plaintiff's care (*id*. at 785-87). Nor has Plaintiff demonstrated that he suffered any prejudice as a result of the error, and harmless errors do not warrant remand. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Perez Torres v. Sec'y of Health and Human Servs.*, 890 F.2d 1251, 1255 (1st Cir. 1989).

B. <u>Assessment of Plaintiff's Credibility</u>

In his decision, the ALJ assessed the credibility of Plaintiff's allegations of disability as follows:

> While I recognize the claimant's excellent work history, and his real and significant impairments, I am most persuaded by his frank admission, in response to my question whether he could perform full-time two sedentary jobs identified and described to him by the vocational expert, that no reason existed to conclude he could not.
>
> The claimant's statement to me at the hearing that Dr. Cowan, the orthopod, had "never told him to lose weight" is, in my view, clearly false. The claimant's obesity clearly aggravates his pain, and no persuasive reason has been presented to me to explain, in light of this, why he continues to remain obese.

(*id*. at 35) (footnote omitted). In support of his finding that Plaintiff's statement was clearly false, the ALJ cites to exhibit 32F, which is Dr. Cowan's post-hearing note that "[a]ll obese patients are advised that if they are having back pain then weight less [sic] could lessen their symptoms" (*id*. at 779). Plaintiff argues that the ALJ's credibility assessment is not supported by substantial evidence because Dr. Cowan did not specifically state that he advised Plaintiff to lose weight, but rather provided a "generic opinion as to all his obese patients" (Dkt. No. 13 at 12).

16

Again, the court disagrees. Dr. Cowan's response that all obese patients are advised that weight loss could lessen their symptoms constitutes substantial evidence that Dr. Cowan told Plaintiff, an obese patient, that weight loss could lessen his symptoms. This is contrary to Plaintiff's testimony that Dr. Cowan never told him to lose weight. The ALJ properly considered the conflict between Dr. Cowan's statement and Plaintiff's testimony in his credibility analysis. 20 C.F.R. § 404.1529(c)(4) (providing that the Agency "will consider … the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence").

In addition, while the ALJ did not expressly discuss it in his opinion, Plaintiff also denied that Dr. Bedford advised him to lose weight, but when asked by the ALJ, Dr. Bedford stated that he had discussed with Plaintiff "on numerous occasions, the benefits of weight loss" (*id*. at 778). This is consistent with Dr. Bedford's March 11, 2013, note indicating that he had recommended a "strong effort at weight loss and core strengthening," based on his opinion that Plaintiff's "protuberant abdomen is a significant factor in his low back pain situation" (*id*. at 699). The conflict between Dr. Bedford's statement and Plaintiff's testimony also supports the ALJ's credibility analysis. 20 C.F.R. § 404.1529(c)(4).

Plaintiff also argues that the ALJ's conclusions as to his credibility are not consistent with SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002), and SSR 82-59, 1982 WL 31384 (1982). The Social Security rulings cited by Plaintiff address when "failure to follow prescribed treatment" can be grounds for denying benefits when the ALJ has found that an individual is disabled by his impairment. SSR 02-1p, 2002 WL 34686281, at *9 (Sept. 12, 2002) ("Before failure to follow prescribed treatment for obesity can become an issue in a case, we must first find that the individual is disabled because of obesity or a combination of obesity and another impairment(s)."); and SSR 82-59, 1982 WL 31384, at *1 (1982) ("Individuals with a *disabling*

*impairment* which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment."). These rulings are inapposite here where the ALJ found Plaintiff not disabled. The ALJ discussed Plaintiff's weight issue in the context of his credibility analysis, not in the context of determining whether Plaintiff's failure to follow medical advice provided grounds for denying benefits. Thus, Plaintiff's argument is without merit.

      C.  Plaintiff's RFC

Plaintiff's final assignment of error is that the ALJ erred in not assessing postural, manipulative, and environmental limitations in his RFC. Drs. DeBorja and Weeratne, the two state agency evaluators, determined that Plaintiff had postural limitations, including only occasional stooping, kneeling, crouching, and crawling, and no climbing ladders/ropes/scaffolds; manipulative limitations, including only occasional overhead reaching; and environmental limitations, including avoiding concentrated exposure to extreme heat and humidity and even moderate exposure to vibration and hazards (*id*. at 103-114, 115-127). In his decision, the ALJ assigned the state evaluators' opinions "minimal weight, finding they are inconsistent with the greater weight of the evidence, and I note that the claimant was never examined by these evaluators" (A.R. at 35).

An ALJ's determination of a claimant's residual functional capacity must be supported by substantial evidence. *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001). When measuring a claimant's capabilities to perform work-related activities, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 7

18

(1st Cir. 1991). This is so because, generally, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996); *see also Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.").

Here, the only two experts to opine on the issues found that Plaintiff had postural, manipulative, and environmental limitations, and they are supported by substantial evidence in the record. Accordingly, the ALJ erred in not including the postural, manipulative, and environmental restrictions in his RFC. *See Nguyen*, 172 F.3d at 35 (citing *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994) ("The ALJ was not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion." (citing *Nieves v. Sec'y of Health & Human Servs.*, 775 F.2d 12, 14 (1st Cir. 1985); *Suarez v. Sec'y of Health & Human Servs.*, 740 F.2d 1 (1st Cir. 1984)). It was not sufficient for the ALJ to refer to "some unspecified aspect of the entire record" as inconsistent with the uncontroverted medial opinions. *Id*.

Nevertheless, as the Commissioner points out, any error was harmless. An individual could perform the jobs the VE identified even with the postural, manipulative, and environmental limitations found by Drs. DeBorja and Weeratne. The order clerk (DOT #249.362-026) and charge account clerk (DOT #205.367-014) jobs require no climbing, balancing, stooping, kneeling, crouching, or crawling, and exposure to extreme heat, humidity, and hazards such as machinery and heights are not present or do not exist. *See* 1991 WL 672320; 1991 WL 671715. While the Dictionary of Occupational Titles for each job indicated that reaching is frequent, existing from 1/3 to 2/3 of the time, the job descriptions make clear that

19

overhead reaching is not required. *See id*. Therefore, Plaintiff cannot sustain his burden of establishing prejudice, and remand is not warranted. *Ward v. Comm'r of Social Security*, 211 F.3d 652, 656 (1st Cir. 2000) (citing *Dantran, Inc. v. United States Dep't of Labor*, 171 F.3d 58, 73 (1st Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("[A] remand is not essential if it will amount to no more than an empty exercise.").

    VII.    Conclusion

For the reasons stated, Plaintiff's motion for judgment on the pleadings (Dkt. No. 12) IS DENIED, and the Commissioner's motion for an order affirming the decision (Dkt. No. 22) IS GRANTED.

It is so ordered.

Dated: Sept. 21, 2017                                        /s/ Katherine A. Robertson
                                                                               KATHERINE A. ROBERTSON
                                                                               United States Magistrate Judge